Hilla Rebay v. Commissioner.
Rebay v. Commissioner
Docket Nos. 94715, 95326.
United States Tax Court
T.C. Memo 1963-42; 1963 Tax Ct. Memo LEXIS 303; 22 T.C.M. (CCH) 181; T.C.M. (RIA) 63042; February 18, 1963
*303 Karl Huber, Esq., 972 Broad St., Newark, N.J., for the petitioner. Alvin C. Martin, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion RAUM, Judge: The Commissioner determined deficiencies in petitioner's income tax for the years 1955-1959 in the respective amounts of $30,417, $28,048, $18,476.75, $22,234.82, and $20,376.42. The principal adjustment, and the only one presently in dispute, is the Commissioner's disallowance in whole or in part of the deductions for charitable contributions by reason of his downward revision of the fair market value of certain paintings contributed by petitioner during the taxable years to several charitable institutions. The parties have filed two stipulations of fact. Petitioner resides at Morningside Drive, Green Farms, Connecticut. She filed her individual Federal income tax returns for 1955-1958 with the district director, Upper Manhattan, New York, and for 1959 with the district director, Manhattan, New York. Petitioner's adjusted gross income during the taxable years, derived primarily from dividends, was as follows: 1955
$143,230.00
1956
159,942.00
1957
148,754.32
1958
134,826.22
1959
140,697.73
*304 During the years 1955-1959 petitioner gave the following non-objective paintings of her own creation to the following charitable organizations, and, in computing the charitable deduction for such gifts claimed the following fair market values for the paintings on her income tax returns: 1955
1956
1957
1958
1959
Arizona State College
"Con Moto"
$30,000
"Andante"
30,000
"Allegro"
$30,000
Milwaukee-Downer College
"Cadenza"
5,000
"Capriccio"
$24,000
Emma Willard School, Troy, N. Y.
"Rondo #1"
$25,000
"Scherzo"
1,000
"Sonnette"
$24,000
Claimed values per returns
$60,000
$35,000
$24,000
$26,000
$24,000
Petitioner was born in Strasbourg, Alsace, in 1890. She has been interested in painting for many years, and particularly in non-objective painting as far back as 1912. She has donated a number of paintings of her own creation to various museums in Europe, and to some in the United States. Her grandfather and her parents had for many years been friends of Solomon R. Guggenheim, and she interested him in non-objective painting in the early 1930's. Guggnheim was a patron of the arts and appears to have *305 been responsible for the establishment of the Solomon R. Guggenheim Museum, New York. She assisted in the formation of the Solomon R. Guggenheim collection of non-objective paintings and was the first Director of the Solomon R. Guggenheim Museum. She retired as Director in 1952, when she became "Director-Emeritus". She has been a trustee of the Solomon R. Guggenheim Foundation since its inception in 1937. A number of her own non-objective paintings have been exhibited in the Solomon R. Guggenheim Museum. In making the adjustments herein the Commissioner determined that the paintings donated in 1955-1957 did not have fair market values in excess of the following total amounts at the dates the paintings were donated: 1955
1956
1957
Arizona State College
$2,000
$1,000
Milwaukee-Downer College
1,000
$3,000
As to the years 1958 and 1959 the Commissioner determined that the paintings donated in those years did not have any fair market value. Prior to 1962 petitioner had never sold any non-objective paintings of her own creation. In the spring of 1962 she sold one such painting for $15,000 to a man named Crane, and has not sold any since then. Crane, *306 an engineer, is associated with petitioner's counsel in certain business ventures. He had never previously purchased a non-objective painting. He is not an art collector, nor does he appear to have any training or specialized knowledge in relation to art. He did not consult any expert in buying petitioner's painting. The price of the most expensive painting that he had ever previously purchased did not exceed $50. The evidence surrounding his purchase of petitioner's painting is of such character that we would hardly be justified in according much weight to it in determining the fair market value of petitioner's paintings. At the trial, the paintings in question were present in the courtroom and we received testimony from an expert in behalf of petitioner and three experts in behalf of the Government as to the fair market value of these paintings. The valuations as of the dates of the gifts testified to by petitioner's expert were substantially less than those claimed in the returns, although they were in turn considerably in excess of those for which the Commissioner contends. The yardstick used by petitioner's expert in making his valuations was the $15,000 sale to Crane, referred *307 to above. The Commissioner's experts in general supported the level of valuation relied upon by him in his determinations for 1955-1957. It would serve no useful purpose to embark upon a discussion of the evidence. Nor are the conclusions reached herein intended to reflect any opinion as to the artistic, aesthetic or intrinsic merits of the paintings in issue. The question is solely one of fair market value at the time of the respective gifts. We have carefully considered the entire record and hereby find as a fact that the paintings in question donated in 1955-1957 did not have a fair market value on the dates of their respective gifts in excess of the amounts determined in respect thereof by the Commissioner, and that the three paintings donated in 1958 and 1959 had a fair market value on the dates of their respective gifts as follows: 1958
1959
"Rondo #1"
$1,000
"Scherzo"
300
"Sonnette"
$1,000
Decisions will be entered under Rule 50.